IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STARSHA RENE MALEK,            )
JASON MALEK, parents and       )
natural guardians of           )
BRYCE HOOSAC, a minor,         )
                               )
            Plaintiffs,        )
                               )
        v.                     )    Civil Action No. 04-546
                               )
SUNBEAM PRODUCTS, INC.,        )    Chief Judge Ambrose/
                               )    Magistrate Judge Hay
            Defendant.         )

REPORT AND RECOMMENDATION

I.   RECOMMENDATION

        It is respectfully submitted that the district court
should grant the motion for summary judgment submitted on behalf
of defendant, Sunbeam Products, Inc. (doc. 33).

II.  REPORT

        Plaintiffs, Starsha Rene and Jason Malek, commenced
this action against defendant, Sunbeam Products, Inc.
("Sunbeam"), on behalf of their minor son, Bryce Hoosac, after he
suffered severe facial burns while Jason Malek held Bryce's face
within an inch or two of the aperture of an operating vaporizer
manufactured by Sunbeam.[1]  Plaintiffs filed suit on March 8,
2004, in the Court of Common Pleas of Westmoreland County,
Pennsylvania,[2] on claims of negligence (Count I), strict

---

[1]     Complaint ¶¶ 6-10 (doc. 1); Affidavit of Jason Malek ("J.
        Malek Aff.")(doc. 48); Deposition of Jason Malek ("J. Malek
        Depo."), p. 158 (doc. 35).

[2]     See Notice of Removal at "SECOND" (doc. 1).

liability (Count II) and breach of warranty (Count III).[3]  On April 8, 2004, Sunbeam removed the case to this Court based on diversity pursuant to 28 U.S.C. § 1332.[4]  Presently before the Court is Sunbeam's motion for summary judgment.

The underlying facts detailing the occurrence are not in dispute.  On November 9, 2002, Bryce Hoosac, age eighteen months, was periodically crying and displaying symptoms of congestion.[5]  In an effort to help alleviate these symptoms, Mr. Malek set up a vaporizer on the dining room table, intending to fill the adjacent area with warm, moist air.[6]  Mr. Malek and Bryce sat on a nearby couch for several minutes and Mr. Malek observed the mist as it flowed out of the vaporizer's aperture.[7]  Bryce's symptoms persisted, however, and Mr. Malek decided to hold Bryce over the vaporizer, hoping to relieve the congestion.[8]  Mr. Malek cradled Bryce over the vaporizer with Bryce facing the

---

[3]   See Complaint (doc. 1).

[4]   See Notice of Removal (doc. 1).  According to the Notice of Removal, plaintiffs are citizens of the Commonwealth of Pennsylvania and defendant is a Delaware corporation with its principal place of business in Boca Raton, Florida.  As well, it has been alleged that the amount in controversy exceeds $75,000.00.  Notice of Removal at "EIGHT," SEVENTH" and "FIFTH."

[5]   J. Malek Depo., p. 135.

[6]   J. Malek Depo., pp. 147-149, 154.

[7]   J. Malek Depo., pp. 152-53.

[8]   J. Malek Depo., p. 153.

2

floor.[9]  Mr. Malek leaned Bryce's head and face into the mist from the vaporizer.[10]  Mr. Malek held Bryce's face approximately one to three inches away from the aperture and did so for several seconds.[11]  Mr. Malek did so despite the fact that Bryce immediately struggled in an attempt to move away from the steam.[12]  Mr. Malek continued to hold Bryce's face over the aperture for a few more seconds before returning to the couch.[13] Bryce continued to cry.[14]

Mrs. Malek heard Bryce's crying, entered the room and asked, "What's wrong with Bryce?"[15]  Mr. Malek responded that the child was not feeling well and took Bryce to his room where Mr. Malek began to rock him.[16]

A short time later, Mr. and Mrs. Malek noticed blisters and bubbling on Bryce's face.[17]  Ultimately they took Bryce to

---

[9]    J. Malek Depo., p. 157.

[10]   Id.

[11]   Id.; J. Malek Aff. (doc. 48).

[12]   J. Malek Depo., pp. 163-164.

[13]   J. Malek Depo., pp. 164-165.

[14]   J. Malek Depo., p. 165.

[15]   Deposition of Starsha Malek ("S. Malek Depo."), p. 114. (doc. 55-3).

[16]   Id.

[17]   S. Malek Depo., p. 116, 120; J. Malek Depo., p. 166.

Mercy Hospital where he was treated for second degree burns to his face.[18]

The subject vaporizer was manufactured by Sunbeam.[19] Mrs. Malek's mother purchased the unit in 2000 upon the recommendation of her physician for use in alleviating her child's congestion.[20]  She gave the unit to the Maleks who used it on numerous occasions without incident prior to November 9, 2002, for themselves and Bryce to treat general congestion, colds and coughs.[21]

*Standard of Review*

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c). See Marzano v. Computer Science Corp., 91 F.3d 497, 501 (3d Cir. 1996).  In deciding a motion for summary judgment the Court must view all inferences in a light most favorable to the non-moving party.  Id., citing Armbruster v. Unisys Corp., 32 F.3d 768, 777

---

[18]   J. Malek Depo., pp. 174-175.

[19]   Defendant's Statement of Facts in Support of Motion for Summary Judgment, ¶ 21 (doc. 35).  As the defendant correctly notes, the plaintiffs did not directly deny or address the facts set forth in defendant's statement of material facts, as required under Local Rule 56.1C.1.(a). Accordingly, those facts are deemed admitted unless otherwise controverted by a separate statement by plaintiffs.  Local Rule 56.1E.

[20]   Deposition of Kimberly Mordecki ("Mordecki Depo."), pp. 11-2 (doc. 35 at Ex. D).

[21]   J. Malek Depo., pp. 103-104; S. Malek Depo., p. 93.

4

(3d Cir. 1994).  The non-moving party, however, may not rely on bare assertions, conclusory allegations or mere suspicions to support its claim but must demonstrate by record evidence the meritorious nature of the claim.  <u>Orsatti v. New Jersey</u>, 71 F.3d 480, 484 (3d Cir. 1995).

*Discussion*

When exercising jurisdiction premised on diversity of citizenship, a federal district court must apply the substantive law of the state whose law governs the action.  <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938).  The parties agree that Pennsylvania law governs this case.

<u>Section 402A, Restatement (Second) of Torts</u>

Pennsylvania has adopted Section 402A of the Restatement (Second) of Torts.  <u>Webb v. Zern</u>, 422 Pa. 424, 220 A.2d 853 (1966).  Under Section 402A of the Restatement, liability will be imposed upon the manufacturer or seller of a product in "a defective condition unreasonably dangerous to the consumer or user."  <u>Craley v. Jet Equipment & Tools, Inc.</u>, 778 A.2d 701, 705 (Pa. Super. 2001).  Thus, in order to recover in a strict liability case, a plaintiff must establish the following five elements: (1) a product; (2) a sale of the product; (3) a user or consumer; (4) a defective condition unreasonably dangerous; and (5) causation.  <u>Schriner v. Pennsylvania Power & Light Co.</u>, 501 A.2d 1128, 1132 (Pa. Super. 1985).  There are

5

three types of defective conditions which may give rise to strict liability: design defect, manufacturing defect, and inadequate warning[22] defect.  <u>Walton v. Avco Corp.</u>, 610 A.2d 454, 458 (Pa. 1992); <u>Ellis v. Chicago Bridge and Iron Co.</u>, 545 A.2d 906, 909 (Pa. Super. 1988).  Plaintiffs' focus appears to be defective design and inadequate warning.[23]

Under Pennsylvania law, the Court must make a threshold determination whether the product in question is "unreasonably dangerous" as a matter of law.  <u>Phillips v. A.P. Green Refractories Co.</u>, 630 A.2d 874, 880 (Pa. Super. 1993).  This determination is to be made "by weighing the utility of the product against the likelihood and seriousness of the injury claimed and the availability of precautions which might have prevented the injury in order to reach the ultimate conclusion whether, as a matter of social policy, the risk of loss is appropriately placed upon the supplier of the product."  <u>Riley v. Becton Dickinson Vascular Access, Inc.</u>, 913 F.Supp. 879, 881 (E.D.Pa. 1995), <u>citing</u> <u>Phillips</u>; <u>Azzarello v. Black Brothers Co., Inc.</u>, 391 A.2d 1020, 1026 (Pa. 1978); <u>Surace v. Caterpillar, Inc.</u>, 111 F.3d 1039, 1044 (3d Cir. 1997).  "In making this

---

[22]    The Pennsylvania Superior Court has expressed a preference for the term "inadequate warning" over "failure to warn" because "the latter language suggests a breach of duty in a way which tends to connote negligence" which is not an element of a products liability claim.  <u>Carrecter v. Colson Equipment Co.</u>, 499 A.2d 326, 330 n.8 (Pa. Super. 1985).

[23]    <u>See</u> Brief on Behalf of the Plaintiff [*sic*], p.5 (doc. 43).

determination the judge acts as a combination social philosopher and risk-utility economic analyst."  Carracter v. Colson Equipment Co., 499 A.2d 326, 330 n.7 (Pa. Super 1985); see also Fitzpatrick v. Madonna, 623 A.2d 322, 324 (Pa. Super. 1993).

In making this threshold determination, the Pennsylvania courts and the federal courts applying Pennsylvania law employ a risk-utility analysis and consider the seven factors set forth by Dean John Wade, commonly referred to as the "Wade" factors:

> (1) The usefulness and desirability of the product -- its utility to the user and to the public as a whole.
>
> (2) The safety aspects of the product -- the likelihood that it will cause injury, and the probable seriousness of the injury.
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
>
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
>
> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
>
> (7) The feasibility, on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

Wade, *On the Nature of Strict Tort Liability for Products*, 44
Miss.L.J. 825, 837-38 (1973)(footnote omitted).  <u>See</u> <u>Shetterly v.
Crown Controls Corp.</u>, 719 F.Supp. 385, 399 (W.D.Pa. 1989);
<u>Surace</u>, 111 F.3d at 1046-47; <u>Shouey v. Duck Head Apparel Co.,
Inc.</u>, 49 F.Supp.2d 413, 426 (M.D.Pa. 1999).  Unless the
"unreasonably dangerous" issue is initially resolved by the Court
in plaintiffs' favor, the case does not go to the jury.  <u>Ellis</u>,
545 A.2d at 910 n. 6; <u>Shetterly</u>, 719 F.Supp. at 389.

     Plaintiffs suggest that the Wade factors do not apply
to inadequate warning cases.  Alternatively, plaintiffs argue
that certain of the Wade factors cannot be resolved by the Court
since there are questions of fact that must be resolved by the
jury.  Plaintiffs misapprehend the law.  First, as the defendant
points out, the Wade factors were originally set forth in the
<u>Azzerello</u> case, where plaintiff made an inadequate warning claim.
Since <u>Azzerello</u>, courts have consistently applied these factors
to failure to warn claims.  <u>See, e.g.</u>, <u>Monahan v. Toto Co.</u>, 856
F.Supp. 955, 965 (E.D.Pa. 1994).  Secondly, the **threshold**
determination as to whether the subject product's condition
justifies placing the risk of loss on the manufacturer is a
question of law for the Court to resolve.  <u>Azzarello</u>, 391 A.2d at
1026; <u>Surace</u>, 111 F.3d at 1044.  "The question for the court to
determine is whether the evidence is sufficient, for purposes of

the threshold risk-utility analysis, to conclude as a matter of law that the product was not unreasonably dangerous, not whether the evidence creates a genuine issue of fact for the jury." Surace, 111 F.3d at 1049 n.10.  As the Third Circuit has recognized,

> [i]f the court determines that the product is defective under the facts as alleged, then the case is submitted to the jury to determine whether the facts indicate that when the product left the manufacturer's control it "lack[ed] any element necessary to make it safe for its intended use or possess[ed] any feature that renders it unsafe for the intended use."

Surace, 111 F.3d at 1044, citing Azzarello, 391 A.2d at 1027. But first, the Court must engage in a risk-utility inquiry in performing the social policy analysis.  Surace, 111 F.3d at 1046.

An application of each of the Wade factors to the facts of this case, even when viewed in a light most favorable to the plaintiffs, reveals that Sunbeam's vaporizer is not "unreasonably dangerous."  Hence, summary judgment in favor of defendant Sunbeam is appropriate.

### (1) The usefulness and desirability of the product -- its utility to the user and to the public as a whole.

There can be no serious question that the subject vaporizer is useful and desirable to the user and the general public.  As noted previously, Mrs. Malek's mother, Kimberly Mordecki, purchased the vaporizer on the recommendation of her

physician, to remedy her child's breathing problems.  Thus, the
vaporizer was desirable to Mrs. Mordecki, the purchaser/user.
The physician specifically suggested the "warm mist" vaporizer
over the "cold mist" type.[24]  Thus, the physician found the warm
mist vaporizer to be useful for Mrs. Mordecki, and presumably for
other patients as well, i.e., the general public.  The Maleks
used the vaporizer for themselves and Bryce on numerous
occasions, which further demonstrates the product's desirability
and usefulness.

In the <u>Shetterly</u> case, the court applied the first Wade
factor to the subject product, i.e., a pallet truck.  The trial
court determined that the product was useful to the
plaintiff/user because it enabled him to accomplish his work
easily and more efficiently.  The pallet truck was desirable and
useful to the purchaser/employer because it resulted in increased
productivity and output.  Lastly, the truck was useful to the
public who was the beneficiary of lowered prices stemming from
increased productivity.  Here, too, the evidence suggests that
the vaporizer was useful and desirable to the plaintiffs, the
purchaser and the general public.  Accordingly, the first Wade
factor weighs in favor of defendant Sunbeam.

**(2) The safety aspects of the product -- the
likelihood that it will cause injury, and the
probable seriousness of the injury.**

---

[24]    Mordecki Depo., pp. 11-12.

The subject vaporizer works by drawing water into an insulated chamber where it is heated to create steam which then flows out of the vaporizer.[25]  There is no dispute here that steam can be extremely hot and can burn a person's skin. Specifically, the parties seem to agree that where human skin is exposed even briefly to steam having a temperature greater than 158 degrees Fahrenheit, a second degree burn can result.[26] According to plaintiffs' expert's analysis, at a distance of two inches from the aperture or portal of Sunbeam's vaporizer the temperature reached 150 degrees Fahrenheit.[27]  This fact, however, does not necessarily mean that the product is unsafe and likely to cause serious injury.

A product is not defective simply because accidents may occur during its intended and ordinary use.  Shetterly, 719 F.Supp. at 400.  Here, the vaporizer was designed to humidify the room air "by producing a volume of vapor into the air at a minimum of 10 ounces liquid per hour."[28]  As well, "[t]he subject vaporizer was not designed to be a facial sauna or have a shroud that might encourage people to direct steam towards themselves as

---

[25]   Defendant's Statement of Material Facts, ¶ 35 (doc. 35).

[26]   Defendant's Reply to Plaintiffs' Statement of Material Facts, Response # 24(b)(doc. 54).

[27]   Deposition of Melvin Rudov, Ph.D. ("Rudov Depo."), Ex. 2 (doc. 44-5).

[28]   Affidavit of Richard J. Prins ("Prins' Aff.), Finding No. 11 (doc. 55-2).

warned against by Sunbeam."[29]  Further, the Maleks had used the
vaporizer without incident on numerous occasions prior to
November 9, 2002.

The evidence suggests that the likelihood of this
vaporizer causing the injury sustained by Bryce Hoosac is, as
defendant states, "practically nil."[30]  Plaintiffs claim that
other children have been similarly burned.[31]  Plaintiffs,
however, have not pointed to any evidence in the record to
support this claim, nor has this Court found any.  "In the
absence of any evidence of other injuries, this factor weighs in
favor of [defendant]."  Epler v. Jansport, Inc., 2001 WL 179862,
* 3 (E.D.Pa. Feb. 22, 2001), citing Van Buskirk v. West Bend Co.,
100 F.Supp. 2d 281, 285 (E.D.Pa. 1999) and Riley v. Warren Mfg.,
688 A.2d 221, 225-226 (Pa. Super. 1997).

Moreover, the evidence appears to contradict
plaintiffs' claim.  Specifically, based on Sunbeam's review of
vaporizer related consumer claims, there has never been another
incident where the product user has intentionally placed his or
her person or another person in close proximity to the steam
vapor flowing at the aperture of the vaporizer so as to result in

---

[29]    Id., Finding No. 12.

[30]    Defendant's Memorandum of Law in support of its motion for
summary judgment, p.10 (doc. 34).

[31]    Brief on Behalf of Plaintiff [*sic*], pp. 6-7 (doc. 43).

12

injury and burns.[32]  Further, Plaintiffs' own expert acknowledged that he had never been presented with a similar factual circumstance and his research had revealed none.[33]

The instant case presents a situation similar to that in Epler, where the plaintiff had worn a particular jacket, manufactured by the defendant, on several occasions.  On one of these occasions, however, as he bent down and flipped up the hood of the jacket while grabbing the hood's draw cords, one of the cords slipped through his hand, recoiled towards his face and struck him in the eye.  Plaintiff brought suit on theories of strict liability, negligence and breach of warranties.  The defendant established that it had manufactured a significant number of products with this same type of cord mechanism and Epler's incident was the only one ever brought to the company's attention.  On this evidence, the court concluded there was a low likelihood of injury.

In the present case, the evidence reflects but one accident –- Bryce Hoosac's –- ever reported to Sunbeam of an individual intentionally placing himself or another human being in close proximity to the steam produced by the vaporizer so as to result in injury and burns.

---

[32]   Defendant's Statement of Facts, ¶ 34 and Ex. F, Affidavit of Richard Prins ¶ 5.

[33]   Rudov Depo., pp. 169-171 (doc. 44-4).

Accordingly, because the chances are so small that a user of the product will intentionally expose their skin or that of another to the steam mist at the aperture of the vaporizer, and the likelihood is high that the consumer will use the product as intended without suffering an injury similar to Bryce Hoosac's, the second Wade factor weighs in favor of defendant Sunbeam.

### (3) The availability of a substitute product which would meet the same need and not be as unsafe.

Plaintiffs offer no substitute product which would meet the same need and not be as unsafe.  The evidence of record suggests that there is none.  Mrs. Mordecki's physician specifically prescribed the use of a warm mist vaporizer as the more effective type of vaporizer or humidifier to relieve respiratory problems.  All of the warm mist vaporizers tested by plaintiffs' expert create the warm mist by first generating steam.  Thus it would seem that steam production and its inherent qualities are essential to warm mist vaporizers.  Because plaintiffs have offered no evidence that a safer substitute product exists that would meet the same needs of the consumer, the third Wade factor weighs in Sunbeams favor.

In discussing the third factor, plaintiffs proposed alternative designs for the vaporizer, which the Court will address in connection with the next factor.

14

**(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.**

Dr. Melvin H. Rudov, a human factors engineer, offered his expert opinion on plaintiffs' behalf, suggesting two alternative designs to eliminate any danger posed by warm mist vaporizers, including Sunbeam's: (1) having the unit "kick out water" at a lower temperature, which would require the addition of a motor with a blade to force the mist through the aperture and which would, obviously, increase the cost of the unit, and (2) placing some sort of protective shroud or guard on the vaporizer to prevent consumers from coming into close contact with the harmful steam.[34]  However, Dr. Rudov has not tested these alternative designs to know whether his suppositions would, in fact, eliminate any safety hazard without impairing the vaporizer's usefulness, and Dr. Rudov acknowledged that neither design is already in the market place.[35]  In sum, plaintiffs have failed to provide any factual support for Dr. Rudov's hypotheses and, as a result, this Court is unable to conclude that Sunbeam could eliminate the alleged unsafe condition through the implementation of either of Dr. Rudov's alternative design

---

[34]   Rudov Depo., pp. 206-208.

[35]   Id. at pp. 205-209 and 249-250.

15

theories.[36]  In this same manner, it also appears that it is unnecessary to discuss defendant's expert's assessment of the proposed alternative design theories.[37]  Accordingly, the fourth Wade factor weighs in favor of defendant.

> **(5) The user's ability to avoid danger by the exercise of care in the use of the product.**

Plaintiffs argue that because the user was Bryce Hoosac, an infant, he lacked an ability to avoid danger. Further, they imply that the Maleks were ignorant of the risk and dangers and/or were misled by any warnings or lack of same and, therefore, could not have exercised due care in handling this potentially dangerous product.

---

[36]  The Court recognizes that this finding also speaks to Dr. Rudov's qualifications to testify as an expert witness in the first instance.  For purposes of this motion, however, even if the Court were to permit this expert testimony, when viewed in a light most favorable to the plaintiffs the testimony is, nevertheless, insufficient to establish this fourth factor.

[37]  Nevertheless, the Court notes that defendant's electrical engineering expert, Richard Prins, concluded that both of Dr. Rudov's alternative designs would hinder the effectiveness of the vaporizer.  First, by reducing the temperature of the steam at the aperture, the volume of moisture being emitted from the unit would be decreased, making the product less effective.  As well, the use of any type of guard or protective shroud would not necessarily prevent scalding.  Use of a shroud would allow moisture to build up on the cowling or shroud, which moisture would drain back into the unit, which could cause the unit to spit hot water, creating a potential hazard, thus making any such alternatively designed product less safe.  Prins' Aff., pp. 30-31.

16

In analyzing the fifth factor, however, the proper focus "is an objective inquiry into whether the class of ordinary purchasers of the product could avoid injury through the exercise of care in the use of the product, not whether this particular plaintiff could have avoided this particular injury." <u>Surace</u>, 111 F.3d at 1051.  The analysis centers on "whether the product is duly safe for its intended use." <u>Id.</u> at 1052.  As Dean Wade explained, "[a] product with adequate instructions for its safe use may as a result be duly safe, and it is not rendered unsafe by the fact that the consumer did not follow the instructions." Wade, <u>supra</u> at 846.

As noted previously, the intended use of this particular vaporizer was to add a warm mist or moisture to a room and not as a facial sauna or nebulizer.[38]  The product had a decal with the following instructions: "CAUTION:  For protection against shock, burns, fires and hazards: read instruction manual before operating unit."[39]  The instruction manual warned the consumer not to touch the steam vapor during use since "steam is hot and burns can occur."[40]  If these instructions were followed, it appears that the average consumer would avoid any danger posed by the steam.

---

[38]   Prins' Aff., Finding No. 12 (doc. 55-2).

[39]   Prins' Aff., Ex. 1, ¶ 6.

[40]   <u>Id.</u>

17

To the extent that an average consumer would consider placing their person close to the warm mist, even if they had not read the caution on the unit and/or the operating instructions, he could easily avoid any danger the steam poses by passing his hand through the vapor at a distance a few inches away from the aperture first to test the temperature.  Use of this simple, common sense test with the subject vaporizer would warn the user of the danger of placing their person at such close proximity to the flow of the mist or steam.  Both Mr. Malek and Dr. Rudov conceded this point.[41]  Thus, the fifth Wade factor weighs in favor of the defendant.

> **(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions**.

The fact that steam is produced when water gets really hot and, thus, can cause a burn, is a principle learned by all school children.  As well, the fact that the closer one gets to the source producing the steam the greater the temperature and, thus, the greater the likelihood of sustaining an injury, also would appear to be a principle known to all school children.  Thus, it appears that the inherent condition of a vaporizer that heats water to produce mist or steam which can result in burns

---

[41]     J. Malek Depo., p. 185; Rudov Depo., p. 35.

is, as a matter of general consensus in the community, an obvious condition of the product which does not require any warning. See Dauphin Deposit Bank and Trust Co. v. Toyota Motor Corp., 596 A.2d 845, 850 (Pa. 1991) (Pennsylvania law imposes no duty to warn of obvious risks); Mucowski v. Clark, 590 A.2d 348 (Pa. Super. 1991) (standard of obviousness of danger for claim in strict liability is virtually identical for purposes of claim in negligence under Pennsylvania's application of Restatement (Second) Torts § 388); Metzger v. Playskool, Inc., 30 F.3d 459, 465 (3d Cir. 1994)("For a risk to be deemed obvious for purposes of a failure to warn claim ... there must be general consensus within the relevant community.").

Moreover, as discussed under factor five, the vaporizer had a cautionary decal and operating instructions, which warn of the danger of a burn by touching the steam or vapor.  Therefore, it would seem that the user's anticipated awareness of the danger inherent in the product and its avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions, weighs in favor of the defendant.

19

**(7) The feasibility, on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.**

In <u>Riley v. Becton Dickinson Vascular Access, Inc.</u>, 913 F.Supp. 879, 890 (E.D.Pa. 1995), the district court concluded that "when consideration of the preceding six [Wade] factors leads to the conclusion that the utility of [the] product in question outweighs its risks, such determination compels the further conclusion that shifting the cost of plaintiff's loss to the manufacturer of the product is not fair, and, therefore, not feasible." Applying this formula to the instant case, because we have concluded based on a risk-utility analysis that the subject vaporizer is not unreasonably dangerous, cost shifting to the defendant is not appropriate and, therefore, not feasible.

<u>Negligence</u>

In order to succeed on a claim for negligence in a products liability case, plaintiffs must establish that defendant owed a duty to conform to a certain standard of conduct, that the duty was breached with respect to the manufacture and sale of the product, and that there was a causal connection between defendant's conduct and the injury suffered. <u>Harsh v. Petroll</u>, 840 A.2d 404, 415 (Pa. Commw. 2003), <u>affirmed</u>, 887 A.2d 209 (Pa. 2005).

Sunbeam argues that it has no duty to plaintiffs since the risk of harm was not foreseeable. <u>Griggs v. Bic Corp.</u>, 981

20

F.2d 1429 (3d Cir. 1993), (abrogated on other grounds by Surace, 111 F.3d at 1046 n. 6).  Plaintiffs have failed to respond to this argument and, therefore, appear to have conceded the point. Nevertheless, the Court will address this argument briefly.

The analysis of whether or not Sunbeam owed the Maleks a duty depends on whether a reasonable person should have foreseen the likelihood of harm.  Epler v. Jansport, Inc., 2001 WL 179862, *6 (E.D.Pa. 2001), citing Monahan v. Toro Co., 856 F.Supp. 955, 965 (1994).  If foreseeable, the Court must determine whether the foreseeable risks were unreasonable.  Id. It appears that the Court is to use a risk-utility analysis and balance "the risk, in light of the social value of the interest threatened, and the probability and extent of harm, against the value of the interest which the actor is seeking to protect." Griggs, 981 F.2d at 1436.  Viewing the case in the light most favorable to the plaintiffs, it appears from our previous discussion of the Wade factors that no reasonable jury could conclude that the risk of harm suffered here was foreseeable and, therefore, Sunbeam is entitled to judgment as a matter of law.

Breach of Warranties

Sunbeam has also moved for summary judgment on plaintiffs' breach of warranties claim at Count III of the Complaint.  Plaintiffs have failed to respond to this argument as

well and, therefore, appear to have conceded the point. Nevertheless, the Court will address this argument briefly.

As the defendant has succinctly stated, the implied warranty of merchantability and the warranty of fitness for a particular purpose arise by operation of law. <u>Vlases v. Montgomery Ward & Co.</u>, 377 F.2d 846, 849 (3d Cir. 1967). For goods to be merchantable they must be "fit for the ordinary purposes for which such goods are used." 13 Pa.C.S.A. § 2314(b). To establish a breach of either warranty, plaintiffs must show that the subject product was defective. <u>Epler</u> at *7. Because the Court has determined that the vaporizer was without defect, plaintiffs' claims for breach of warranties must fail.

III. <u>CONCLUSION</u>

For the above-stated reasons, the district court should grant the motion for summary judgment submitted on behalf of the defendant, Sunbeam.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of the

objections to respond thereto.  Failure to timely file objections
may constitute a waiver of any appellate rights.

                                    Respectfully submitted,


                                    /s/ Amy Reynolds Hay
                                    AMY REYNOLDS HAY
                                    United States Magistrate Judge

Dated: 30 January, 2006.



cc:  Hon. Donetta W. Ambrose
     Chief United States District Judge

     Neil J. Marcus, Esquire
     Marcus, Black & Spadafore
     204 West Main Street
     P.O. Box 652
     Monongahela, PA 15063-0652

     Kathleen S. McAllister, Esquire
     DiBella, Geer, McAllister & Best, P.C.
     312 Boulevard of the Allies
     3rd Floor
     Pittsburgh, PA 15222

     James M. Rozak, Esquire
     James W. Ozog, Esquire
     Wiedner & McAuliffe, Ltd.
     One North Franklin, Suite 1900
     Chicago, IL 60606